[No. S024822. July 22, 1993.]

TERRY L. SCHNABEL et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MARILYN J. SCHNABEL, Real Party in Interest.

COUNSEL

Roquemore, Pringle & Moore, John P. Pringle and Peter C. Anderson for Petitioners.

No appearance for Respondent.

James C. Booth for Real Party in Interest.

## OPINION

**ARABIAN, J.**—One spouse employed by a close corporation is record shareholder of 30 percent of its stock. The stock is community property. We must decide the scope of the other spouse's right to discover records of the corporation in a marriage dissolution proceeding.

The trial court and Court of Appeal ordered the corporation to produce business records and corporate and quarterly payroll tax returns. We affirm the judgment as to the business records; the trial court acted within its discretion in ordering their production. We further conclude that the corporate tax returns and payroll tax returns regarding the shareholder spouse were properly ordered produced, but that any information in the payroll tax returns identifying other persons need not be disclosed.

### I. FACTS

The relevant facts are undisputed. Terry and Marilyn Schnabel separated in 1991 after 25 years of marriage. Marilyn petitioned for a dissolution of the marriage, and requested spousal support, determination of property rights, and attorney fees. There were no minor children of the marriage. Terry is employed by and is the record shareholder of 750 shares, approximately 30

percent of the stock, of Orange Container, Inc. (Orange Container), a close corporation. The stock is community property. A third party owns the remainder of the stock. Marilyn hired a certified public accountant to appraise the corporation's value and to ascertain Terry's remuneration and benefits.

After informal attempts at discovery were unsuccessful, Marilyn served a deposition subpena for production of business records on the custodian of records of Orange Container pursuant to Code of Civil Procedure section 2020. The subpena sought production of a broad range of business and tax records of the corporation, including the corporate tax returns, quarterly payroll tax returns, profit and loss statements, bank activity statements, and records reflecting compensation and benefits paid to Terry.[1]

Orange Container produced its profit and loss and financial statements (item 2) and all records relating to Terry personally (items 4 to 10). It moved

---

[1]Specifically, the subpena demanded production of:

"1. Corporate tax returns prepared and/or filed for fiscal years ending September 30, 1990, covering the period of 1986 to 1990.

"2. Copies of all profit and loss statements and financial statements relative to said corporation for the period commencing with the end of the period for which the last corporate tax return was prepared and/or filed (to include but not limited to such financial records for period ending May 28 to June 30, 1991.)

"3. Bank activity statements, check registry setting forth nature of payment and payee (or canceled checks in lieu of check registry) for all bank depository accounts maintained in behalf of said corporation for the period of January 1, 1991 to date.

"4. Records of said corporation setting forth charges made by Terry Lee Schnabel through business credit cards for the period of January 1, 1991 to present.

"5. Records of all expenses reimbursements made to Terry Lee Schnabel for the period of January 1, 1991 to present (setting forth nature of expense and amount).

"6. Records of all perquisites or benefits provided to Terry Lee Schnabel by said corporation for the period of January 1, 1991 to the present, including, but not limited to, auto expense allowance, insurance (life, medical and auto).

"7. Records of all officer loans made to or from Terry Lee Schnabel setting forth activity thereon (distribution and payments) for the period of January 1, 1990 to the present.

"8. Records of all pension, retirement, 401K savings, stock options offered or maintained by the corporation in which Terry Lee Schnabel has an interest. Said records to include from the inception of said plans, copies of the plans, participant account records, annual federal reports such as form 50000C if any.

"9. Compensation records of Terry Lee Schnabel for the period of January 1, 1990, to the present, setting forth wages, commissions, bonuses or other compensation paid by said corporation to Terry Lee Schnabel (said records to show gross compensation, deductions, and net payments).

"10. Records of all monies paid to third parties in behalf of Terry Lee Schnabel, or for his benefit, for the period of January 1, 1991, to the present.

"11. Corporate books for all business and or professional savings for a period of October 1, 1989 to date.

"12. Detailed aged listing of accounts receivable and accounts payable at the date of the latest financial statement of May 31 and/or July 1, 1991.

"13. General ledgers, cash receipts, cash disbursements, daily charge sheets, sales and

to quash the subpena for the remainder of the requested information, claiming it was "irrelevant, privileged, confidential and an invasion of privacy of the non-party shareholder" of the corporation. Terry's declaration filed in support of the motion to quash stated that the remaining documents "may disclose personal information of the majority shareholder . . . ." Marilyn's opposition to the motion attached the accountant's declaration detailing the reasons each of the disputed items of information was necessary in order to independently verify the information already produced.

The superior court denied the motion to quash. Terry and Orange Container filed the instant petition for writ of prohibition/mandate in the Court of Appeal asking that the superior court be ordered to grant the motion. The Court of Appeal summarily denied the petition. We granted review and transferred the matter to the Court of Appeal with directions to vacate its order denying the petition and issue an alternative writ. Thereafter, that court issued an opinion again denying the petition, and holding that both the business and the tax records were properly ordered produced.

We granted review.

## II. Discussion

The courts below ordered the corporation to produce both business records and tax returns. We discuss each category of documents separately.

### A. *Business Records*

Orange Container voluntarily produced its profit and loss and financial statements and all records relating to Terry personally. The trial court ordered production of much more—a wide range of other business records for specified time periods, such as bank activity statements, accounts receivable and payable listings, ledgers, cash receipts and disbursement records, and sales and purchase registers. (See *ante*, fn. 1.)

---

purchase registers and journals for period November 1, 19898 [*sic*] to date for general and trust accounts.

"14. Federal and California quarterly payroll tax returns for period of October 1, 1989 to date.

"15. Corporate Minute and Stock records books for all Corporate entities.

"16. Leases on all real or personal property owned and/or rented out by said corporation.

"17. Business credit card statements, and receipts such as Bank of America Mastercharge, American Express, etc., for October 1, 1989 to date.

"18. Copies of all Corporate bank loan documents and applications for all loans active or applied for relative to period of October 1, 1989 to date (to include any records for loan guarantees).

"19. Copies of any pending or prior offers to purchase business or business assets such as patients [*sic*] or otherwise."

█ "Under the discovery statutes, information is discoverable if it is unprivileged and is either relevant to the subject matter of the action or reasonably calculated to reveal admissible evidence." (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 655-656 [125 Cal.Rptr. 553, 542 P.2d 977] [*Valley Bank*]; see Code Civ. Proc., § 2017, subd. (a).) █ At the outset, we note that information about the value of community assets and the parties' financial status is clearly relevant to the spouse's interests in obtaining a fair division of those assets and fair attorney fee and spousal support (and, in other cases, child support) awards. Moreover, at least as to a division of assets and child and spousal support awards, those interests are strongly protected by California law.

The Legislature has recently declared: "It is the policy of the State of California (1) to marshal, preserve, and protect community and quasi-community assets and liabilities that exist at the date of separation so as to avoid dissipation of the community estate prior to distribution, (2) to ensure fair and sufficient child and spousal support awards, and (3) to achieve a division of community and quasi-community assets and liabilities upon the dissolution of marriage as provided for under California law. [¶] . . . [¶] In order to promote this public policy, a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of the dissolution of marriage action, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties." (Civ. Code, § 4800.10, subd. (a), eff. Jan. 1, 1993.)

This policy is further emphasized by Civil Code section 4800.11, subdivision (a)(1), also effective January 1, 1993: "The State of California has a strong policy of ensuring the division of community and quasi-community property in the dissolution of a marriage as set forth in Section 4800, and of providing for fair and sufficient child and spousal support awards. These policy goals can only be implemented with full disclosure of community, quasi-community, and separate assets, liabilities, income and expenses, as provided for in Section 4800.10, and decisions freely and knowingly made."

Despite the strong policy in favor of disclosure, we must also consider any third party right to financial privacy. In *Valley Bank, supra*, 15 Cal.3d 652, a private litigant sought discovery of bank records that would have revealed information disclosed to the bank in confidence by third party customers. The bank objected, claiming that the information sought was privileged. We rejected the claim, finding that, unlike the lawyer-client or physician-patient privileges, there was no statutory bank-customer privilege. █ "Furthermore it is clear that the privileges contained in the Evidence Code are

*exclusive* and the courts are not free to create new privileges as a matter of judicial policy. (Evid. Code, § 911, subd. (b); *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 539-540 [113 Cal.Rptr. 897, 522 P.2d 305].)" (*Id.* at p. 656, italics in original.)

Nevertheless, despite the absence of an absolute privilege, we found that the constitutional right of privacy (Cal. Const., art. I, § 1) provided a "limited form of protection for confidential information given to a bank by its customers." (*Valley Bank, supra,* 15 Cal.3d at p. 656.) Therefore, "we indulge in a careful balancing of the right of civil litigants to discover relevant facts, on the one hand, with the right of bank customers to maintain reasonable privacy regarding their financial affairs, on the other." (*Id.* at p. 657.)

■ We summarized the duty of trial courts to reconcile the conflicting interests of litigants in obtaining necessary discovery and third parties in maintaining privacy: "[I]n evaluating claims for protection of bank customers, the trial courts are vested with the same discretion which they generally exercise in passing upon other claims of confidentiality. [Citations.] We have previously expressed those considerations which, among others, will affect the exercise of the trial court's discretion. They include '. . . the purpose of the information sought, the effect that disclosure will have on the parties and on the trial, the nature of the objections urged by the party resisting disclosure, and ability of the court to make an alternative order which may grant partial disclosure, disclosure in another form, or disclosure only in the event that the party seeking the information undertakes certain specified burdens which appear just under the circumstances.' (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 382 [15 Cal.Rptr. 90, 364 P.2d 266].) Where it is possible to do so, '. . . the courts should impose partial limitations rather than outright denial of discovery.' (*Id.* at p. 383.)" (*Valley Bank, supra,* 15 Cal.3d at p. 658.) We noted the availability of procedural devices such as in camera hearings to further accomodate the conflicting interests. (*Ibid.*)

The *Valley Bank* analysis was applied to a marriage dissolution proceeding in *Rifkind* v. *Superior Court* (1981) 123 Cal.App.3d 1045 [177 Cal.Rptr. 82]. There, the husband was the president of an incorporated law firm of 28 lawyers, 14 of whom were shareholders. The husband agreed to produce the financial reports of the law corporation and all documents relating to his own "earnings, pension contributions and obligations." (*Id.* at p. 1048.) In addition, the wife sought, and the trial court ordered, production of income tax returns of the law corporation and of three partnerships, and "the records of the compensation, pensions, profit sharing plans and obligations of the other shareholders of the law corporation." (*Ibid.*)

The Court of Appeal found that the corporate records relating only to other shareholders and their families "have no apparent relevance to any of the issues to be resolved in this matrimonial proceeding. Nor has there been any showing that such documents will lead to the discovery of relevant information. The only apparent effect of the production of these three categories would be to invade the privacy of some 14 attorneys and their families who have no part in the pending matrimonial dispute." (*Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at p. 1050.) The trial court therefore erred in ordering the records produced. "When the interest of a private litigant in discovering relevant facts conflicts with the right of others to maintain reasonable privacy regarding their financial affairs, a court must 'indulge in a careful balancing' before ordering disclosure. (See *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 657 [125 Cal.Rptr. 553, 542 P.2d 977].) It follows that a court must not generously order disclosure of the private financial affairs of nonparties without a careful scrutiny of the real needs of the litigant who seeks discovery. It does not appear that any such balancing process occurred in the proceeding which is here under review." (*Id.* at pp. 1050-1051.)

The *Rifkind* court therefore ordered the trial court to vacate its order for the production of business records, but "without prejudice to such further order for production of documents as the court may find to be consistent with the principles set forth in this opinion." (*Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at p. 1052.)

In *Harris* v. *Superior Court* (1992) 3 Cal.App.4th 661 [4 Cal.Rptr.2d 464], a former wife seeking to increase child support payments sought discovery of financial records of a third person who shared a house with the former husband. Although recognizing that the third person's contributions to the former husband's living expenses were relevant to the court's determination of the husband's ability to pay child support, the appellate court held that the wife was not entitled to discovery from the third person as a matter of routine. "When the right to discovery conflicts with a privileged right, the court is required to carefully balance the right of privacy with the need for discovery." (*Id.* at p. 665.) Absent a specific showing, the court held that the former wife should direct her discovery towards the former spouse, not the third party. (*Id.* at p. 667.)

The *Harris* court did not, however, completely exclude the possibility of discovery from the third party. "Under other facts, some discovery of a third party's financial records may be appropriate. An ex-husband, for example, upon moving in with a third party, is suddenly living in sumptuous surroundings, driving luxury cars and wearing expensive clothes. Depending upon

what the discovery of the ex-husband reveals, discovery concerning financial contributions made by a third party to the ex-husband's living expenses may be appropriate. [¶] Even under these circumstances, the third party deponent is presumptively entitled to a protective order that limits disclosure of financial information. (*GT, Inc.* v. *Superior Court* (1984) 151 Cal.App.3d 748 [198 Cal.Rptr. 892, 43 A.L.R.4th 111].) The trial court is required to limit the scope of inquiry to the extent necessary to a fair resolution of the case. (*Moskowitz* v. *Superior Court* [1982] 137 Cal.App.3d [313,] 316 [187 Cal.Rptr. 4].) The court is obliged to examine the financial information in chambers and shall exclude from disclosure any information that does not meet this standard. (*Valley Bank of Nevada* v. *Superior Court, supra,* 15 Cal.3d at p. 658.)" (*Harris* v. *Superior Court, supra,* 3 Cal.App.4th at p. 668.)

█ From these cases and statutes, the general rule can be distilled that when one spouse in a marriage dissolution proceeding seeks discovery from a third party, the court is required to balance the spouse's need for discovery against the privacy interests of the third party. In weighing the need of the spouse, the court should consider all relevant factors, including how the requested information would help resolve the issues that remain between the spouses; any relationship between either spouse and the third party; the information that the other spouse or third party has already provided or agreed to provide; and any specific reasons to distrust the adequacy or reliability of the information already obtained or offered.

In weighing the privacy interests of the third party, the court should consider the nature of the information sought, its inherent intrusiveness, and any specific showing of a need for privacy, including any specific harm that disclosure of the information might cause. For example, the third party may demonstrate that public disclosure of confidential information would damage its competitive position or embarrass persons not involved in the litigation. Upon request, the court should review the information in camera before production to assess its value to the requesting spouse and the harm disclosure might cause to the third party. Any discovery order should be carefully tailored to protect the interests of the requesting spouse in obtaining a fair resolution of the issues while not unnecessarily invading the privacy of the third party. Also upon request, the court should consider appropriate protective orders. (Code Civ. Proc., § 2025, subd. (i); *Harris* v. *Superior Court, supra,* 3 Cal.App.4th at p. 668.)

█ Applying these principles to this case, two factors are paramount—the need for the requested information to help resolve the issues that remain between the spouses, and the relationship between the spouses and Orange

Container. Terry is a shareholder of record, and has all the rights of such a shareholder, including the right to inspect records. (Corp. Code, § 1601.) Since the stock is community property, Marilyn has an equal interest in that stock. (Civ. Code, § 5105.) Indeed, with specified exceptions not relevant here, the court "may order that the name of a spouse shall be added to community property held in the name of the other spouse alone . . . ." (Civ. Code, § 5125.1, subd. (c).) Thus, although Marilyn is not the "holder of record" under Corporations Code section 185, she is, for this purpose, entitled to the same information as Terry.

Furthermore, each spouse has a fiduciary duty to the other in managing community property, which "duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . , *and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request.*" (Civ. Code, § 5125, subd. (e), italics added.)

The italicized language makes clear that each spouse is entitled to *complete* disclosure of all relevant information to allow an independent review of the marital property and financial status of the spouses. (See also Civ. Code, §§ 4800.10, 4800.11, subd. (a)(1), and 5103, subd. (b).) Whatever right Terry has to inspect records of the corporation, Marilyn also has, either indirectly through Terry, or directly, as in this case, by means of third party discovery. It follows that if Terry has a right to inspect any corporate records, he cannot, consistent with his fiduciary duty, refuse to cooperate in obtaining for Marilyn those records that are relevant to this proceeding. We therefore conclude that in this proceeding, Marilyn has at least as great a right of discovery from the corporation as any shareholder.

We next consider the inspection rights of a shareholder. Corporations Code section 1601, subdivision (a), provides in pertinent part: "The accounting books and records . . . shall be open to inspection upon the written demand on the corporation of any shareholder . . . at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder . . . ."

There can be no doubt that Marilyn's purpose in seeking the corporate records—to ascertain the value of the stock and the community's and Terry's financial status—is reasonably related to her interest as a shareholder. (See Civ. Code, §§ 4800.10 and 4800.11.) ■ This court long ago held that "a stockholder has an interest in the assets and business of the corporation and

that such inspection [of the books of the corporation] may be necessary or proper for the protection of his interest or for his information as to the condition of the corporation and the value of his interests therein." (*Hobbs* v. *Tom Reed Gold Min. Co.* (1913) 164 Cal. 497, 501 [129 P. 781]; see also *Tatko* v. *Tatko Bros. Slate Co., Inc.* (1991) 173 App.Div.2d 917 [569 N.Y.S.2d 783, 784] [discussing the common law right of a shareholder]; *Friedman* v. *Altoona Pipe and Steel Supply Company* (3d Cir. 1972) 460 F.2d 1212, 1213 [interpreting a similar Pennsylvania statute].)

It remains to examine the scope of the phrase "accounting books and records" in this context. (Corp. Code, § 1601.) California cases have not extensively discussed the question. In *Mooney* v. *Bartenders Union Local No. 284* (1957) 48 Cal.2d 841 [313 P.2d 857, 64 A.L.R.2d 1154], we held that a union member had a right to inspect union records similar to a shareholder's right to inspect corporate records, and affirmed the trial court's ruling that he was entitled to "inspect all records and books of account . . . ." (*Id.* at p. 843.) We stated that the member was "entitled to inspect [the union's] financial records," but did not further define what this meant. (*Ibid.*) In *Goldstein* v. *Lees* (1975) 46 Cal.App.3d 614, 621 [120 Cal.Rptr. 253], the court stated that "although shareholders have some rights to corporate information not available to the general public, shareholder status does not in and of itself entitle an individual to unfettered access to corporate confidences and secrets." It noted that under a predecessor statute to Corporations Code section 1601, a shareholder had a right to inspect "the books of account," but did not further define the term. (*Ibid.*)

In *Austin* v. *Turrentine* (1939) 30 Cal.App.2d 750, 762 [87 P.2d 72], the court stated that the "enactment of statutes relative to the remedy of obtaining evidence by inspection was had with a view of providing a more speedy and less expensive remedy . . . , and, being remedial in their nature, they should be liberally construed." *Austin* held that the shareholders were "entitled, under the supervision of the . . . court to have produced for the inspection of the court such books, papers, records, journals and entries as, in the light of the pleadings and issues, may be material and pertinent, and such records should not be sealed against judicial inquiry." (*Id.* at p. 763.)

Cases from other jurisdictions are more informative, and tend to define the scope of the inspection right broadly. In *Friedman* v. *Altoona Pipe and Steel Supply Company, supra*, 460 F.2d at pages 1212-1213, the court, interpreting a Pennsylvania statute that referred to "books or records of account," held that the shareholder had the right to inspect the "original records," and that "production of summaries" was insufficient. In *Meyer* v. *Ford Industries, Inc.* (1975) 272 Ore. 531 [538 P.2d 353, 88 A.L.R.3d 653], the court

extensively analyzed the scope of the phrase "books and records of account," and concluded that it was not "limited to 'books and records of account' in any 'ordinary,' literal or otherwise limited sense," but should be broadly construed "so as to extend to all records, contracts, papers and correspondence to which the common law right of inspection of a stockholder may properly apply." (*Id.* at p. 358.)

■ We need not precisely define the shareholder right of inspection in all situations. This is a marriage dissolution proceeding, not a shareholder inspection action. The shareholder rights support Marilyn's claim to third party discovery, but Marilyn's rights here and another shareholder's rights in other situations are not necessarily coextensive. Our resolution of this issue rests on the combination of Marilyn's need to discover the records, the legislatively declared policy in favor of disclosure, and the shareholder right of inspection. Given the strong public policy in favor of fair child and spousal support awards and a fair division of community assets, we believe that the "accounting books and records" discoverable in this proceeding should be construed to encompass the records reasonably related to this purpose.

This statement also contains its limitation; the right of inspection does not extend to records not reasonably related to the proper purpose for which it is sought, and a trial court acts within its discretion in limiting such discovery. (*Tatko* v. *Tatko Bros. Slate Co., Inc., supra,* 569 N.Y.S.2d at p. 785 ["[A]lthough the scope of the inspection right is broad [citation], it is limited to those documents which in the trial court's exercise of reasonable discretion the situation requires be reviewed. . . ."].)

Here, all requested documents were relevant to the corporation's value and the parties' financial status. The uncontroverted declaration of Marilyn's accountant detailed the reasons why each requested item of information was necessary to independently verify the information already produced. The requests were generally for specified limited time periods. Moreover, the shares of this close corporation, unlike shares that are traded on the open market, do not have a readily ascertainable market value. Thus, the records were relevant and discoverable.

Terry argues that the right of inspection of a shareholder does not aid Marilyn because she did not bring a shareholder's suit. The argument misses the point. Marilyn is seeking third party discovery in a dissolution proceeding. The shareholder's right of inspection merely helps define the scope of her discovery rights from the corporation; it does not inform the necessary procedure.

We must next weigh the privacy interests of the third party. In this regard, we note that although Orange Container may have been entitled to an in camera review of the documents upon request, or to a protective order upon a proper showing, neither was requested. In addition, its showing in support of its privacy interests was weak. It relied only on the declaration of Terry himself asserting that the information requested "may disclose personal information of the majority shareholder . . . ." The trial court could justifiably discount such a summary and self-serving statement by the nonrequesting spouse. There was no specific showing of the privacy interests of the majority shareholder or of damage the corporation might suffer from disclosure of confidential information. Moreover, any expectation of privacy that Orange Container might assert against Marilyn was diminished given her substantive right of equal access to all corporate information that was obtainable by Terry. (See Civ. Code, § 5125, subd. (e).) Accordingly, we find that the order of discovery was well within the court's discretion.

Terry and Orange Container argue that the record does not disclose that the trial court properly exercized its discretion. At the hearing on the motion to quash and in its written order, the court did not state reasons for its ruling, but summarily denied the motion. ■ However, an "order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) ■ Although often desirable to aid appellate review, no statement of reasons for a ruling on a motion to quash is required. (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 384 [15 Cal.Rptr. 90, 364 P.2d 266].) Moreover, the strong policy in favor of full disclosure in a dissolution proceeding, the broad scope of records which a spouse-shareholder is entitled to inspect, and the weak countershowing of the corporation, compelled a correct decision by the trial court.

### B. *Tax Returns*

■ The court also ordered the corporation to produce its corporate tax and "quarterly payroll tax returns."[2] Orange Container argues that the returns are privileged. Thus, we must decide whether the state's policy in favor of full disclosure of information relevant to the issues of this case, together

---

[2] We assume that the term "quarterly payroll tax returns," which the parties do not further define, refers to the quarterly returns regarding income tax withheld by employers filed pursuant to Revenue and Taxation Code section 18491 and Unemployment Insurance Code sections 13020 and 13021.

with the shareholder's right of inspection, creates an exception to the general privilege.[3]

The seminal case involving the discoverability of tax returns by private litigants is *Webb* v. *Standard Oil Co.* (1957) 49 Cal.2d 509 [319 P.2d 621] (*Webb*). In *Webb*, the defendants in a tort case sought discovery of the plaintiffs' state and federal income tax returns. We construed Revenue and Taxation Code section 19282, which then provided in pertinent part that, except in tax enforcement proceedings, " '. . . it is a misdemeanor for the Franchise Tax Board, any deputy, agent, clerk, or other officer or employee, to disclose in any manner information as to the amount of income or any particulars set forth or disclosed in any report or return required under this part.' " (*Webb, supra,* 49 Cal.2d at p. 512.) The current section, although rewritten, is substantially similar in relevant respects. (See *Sav-On Drugs, Inc.* v. *Superior Court* (1975) 15 Cal.3d 1, 6 [123 Cal.Rptr. 283, 538 P.2d 739].)

Although, by its language, this statute "appears to be directed only toward administrative officers, and does not expressly establish a privilege of the nature claimed by petitioner" (*Sav-On Drugs, Inc.* v. *Superior Court, supra,* 15 Cal.3d at p. 6), we interpreted it in *Webb, supra,* 49 Cal.2d 509, to establish an implied privilege against forced disclosure in civil discovery proceedings. We noted that the purpose of the statute "is to facilitate tax enforcement by encouraging a taxpayer to make full and truthful declarations in his return, without fear that his statements will be revealed or used against him for other purposes. If the information can be secured by forcing the taxpayer to produce a copy of his return, the primary legislative purpose of the secrecy provisions will be defeated. The effect of the statutory prohibition is to render the returns privileged, and the privilege should not be nullified by permitting third parties to obtain the information by adopting the indirect procedure of demanding copies of the tax returns." (*Id.* at p. 513.)

Because of the overlap of information contained in federal and state tax returns, we also held that "forcing disclosure of the information in the federal tax return would be equivalent to forcing disclosure of the state returns and would operate to defeat the purposes of the state statute. It follows that the trial court did not err in refusing to require production of copies of either the state or federal tax returns." (*Webb, supra,* 49 Cal.2d at pp. 513-514.)

---

[3]This is solely a question of state law. There does not appear to be a privilege for tax returns under federal law. (*Premium Service Corp.* v. *Sperry & Hutchinson Co.* (9th Cir. 1975) 511 F.2d 225, 229; *Heathman* v. *United States Dist. Ct. for Cent. Dist. of Cal.* (9th Cir. 1974) 503 F.2d 1032, 1035; see *Crest Catering Co.* v. *Superior Court* (1965) 62 Cal.2d 274, 276, fn. 1 [42 Cal.Rptr. 110, 398 P.2d 150].)

This privilege against forced disclosure of tax returns has been reaffirmed in a variety of situations by both this court and the courts of appeal. (*Sav-On Drugs* v. *Superior Court, supra,* 15 Cal.3d at pp. 3, 6-7 [information related to sales tax returns is privileged]; *Crest Catering Co.* v. *Superior Court, supra,* 62 Cal.2d 274 [employment tax returns are privileged, but the privilege was waived]; *King* v. *Mobile Home Rent Review Bd.* (1989) 216 Cal.App.3d 1532 [265 Cal.Rptr. 624] [privilege applies to administrative proceedings]; *Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at pp. 1048-1049 [income tax returns of a law corporation and three partnerships of which husband was a member are privileged in a marriage dissolution proceeding]; *Sammut* v. *Sammut* (1980) 103 Cal.App.3d 557, 562 [163 Cal.Rptr. 193] [privilege applies to "discovery of income tax returns in litigation between former spouses in spousal support modification proceedings"]; *In re Marriage of Brown* (1979) 99 Cal.App.3d 702, 707-709 [160 Cal.Rptr. 524] [privilege applies to income tax records of new spouse in litigation between former spouses involving child support payments]; *Brown* v. *Superior Court* (1977) 71 Cal.App.3d 141 [139 Cal.Rptr. 327] [privilege applies to W-2 forms].)[4]

Our decision in *Webb, supra,* 49 Cal.2d 509, interpreted Revenue and Taxation Code section 19282, which concerns that part of the code dealing with personal income tax. However, an equivalent statute covers bank and corporation tax. (Rev. & Tax. Code, § 26451.)[5] These equivalent statutes should be interpreted consistently, and the same privilege should apply. (See *Sav-On Drugs, Inc.* v. *Superior Court, supra,* 15 Cal.3d at pp. 6-7 [applying the *Webb* rule to Rev. & Tax. Code, § 7056, the equivalent statute for sales and use taxes].)

---

[4]This privilege is sometimes described as "judicially created." (E.g., *King* v. *Mobile Home Rent Review Bd., supra,* 216 Cal.App.3d at p. 1537; *Sammut* v. *Sammut, supra,* 103 Cal.App.3d at p. 560; *Miller* v. *Superior Court* (1977) 71 Cal.App.3d 145, 147 [139 Cal.Rptr. 521].) This is not entirely accurate. Given our repeated admonition that because of the exclusivity of the privileges contained in the Evidence Code, courts may not create nonstatutory privileges as a matter of judicial policy, this characterization is also somewhat misleading. (*Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 769 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214]; *Valley Bank, supra,* 15 Cal.3d at p. 656; Evid. Code, § 911, subd. (b); see also *County of Alameda* v. *Superior Court* (1987) 194 Cal.App.3d 254, 260-261 [239 Cal.Rptr. 400].) Although the privilege is not expressly stated in the statute, it is based on the statutory language and underlying policy. (See *Webb, supra,* 49 Cal.2d 509; *Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825, 829 [134 Cal.Rptr. 130].) The privilege is thus "impliedly based on statute. . . ." (*Welfare Rights Organization* v. *Crisan, supra,* 33 Cal.3d at p. 769.)

[5]Revenue and Taxation Code section 26451 provides in pertinent part that "it is a misdemeanor for the Franchise Tax Board or any member thereof or [other specified person] who in the course of his or her employment or duty has or had access to returns, reports or documents required under this part, to divulge or make known in any manner the amount of income or any particulars relating to the business affairs of the taxpayer set forth or disclosed therein."

The statutory privilege as to quarterly payroll tax returns is even clearer. Unemployment Insurance Code section 1094 provides, with exceptions not here relevant, that "the information obtained in the admininstration of this code shall be for the exclusive use and information of the director . . . and shall not be open to the public, nor admissible in evidence in any action or special proceeding . . . ." (See *Crest Catering Co.* v. *Superior Court, supra,* 62 Cal.2d at pp. 276-277.) We thus conclude that the privilege of *Webb, supra,* 49 Cal.2d 509, generally applies to the kinds of tax returns involved in this case.

 The privilege is not absolute. In *Sav-On Drugs, Inc.* v. *Superior Court, supra,* 15 Cal.3d at page 8, for example, we found information related to sales tax returns to be privileged, but also cautioned that "no attempt has been made herein to define the full ambit of the privilege considered above, nor are we called upon to determine whether under other circumstances discovery of tax returns and records would be permissible. Our decision is a narrow one, limited to the record before us." As explained in *Sammut* v. *Sammut, supra,* 103 Cal.App.3d at page 560, the privilege is waived or does not apply in three situations: "(1) there is an intentional relinquishment (*Crest Catering Co.* v. *Superior Court* (1965) 62 Cal.2d 274, 278), (2) the 'gravamen of [the] lawsuit is so inconsistent with the continued assertion of the taxpayer's privilege as to compel the conclusion that the privilege has in fact been waived' (*Wilson* v. *Superior Court, supra,* 63 Cal.App.3d at p. 830), or (3) a public policy greater than that of confidentiality of tax returns is involved (*Miller* v. *Superior Court, supra,* 71 Cal.App.3d at p. 149)."

 The first two of these situations do not apply here. Orange Container has not waived the privilege. It is not a party to the underlying litigation, so has done nothing inconsistent with the assertion of the privilege. (Cf. *Wilson* v. *Superior Court, supra,* 63 Cal.App.3d 825 [plaintiff may not assert privilege as to tax returns she placed into issue in a lawsuit alleging that her accountants misadvised her regarding her taxes].) The question we must decide is whether a public policy exception applies. As we explain, this exception has been narrowly construed, and has been applied only when warranted by a legislatively declared public policy.

Only one case has found that public policy mandated an exception to the privilege. In *Miller* v. *Superior Court, supra,* 71 Cal.App.3d 145, contempt proceedings were instigated against the petitioner for failure to pay child support. The petitioner claimed he was unable to pay the support, but asserted the privilege against forced disclosure of his tax returns. Relying on specific statutes that allowed public agencies access to certain tax information, the court concluded that the "policy favoring the confidentiality of tax

returns must give way to the greater public policy of enforcing child support obligations." (*Id.* at p. 149.) The court stressed that its "decision is limited to the narrow issue of the assertion of the privilege of nondisclosure of income tax returns in the context of proceedings to enforce child support obligations. In that context, we hold that the privilege does not apply." (*Ibid.*)

The holding of *Miller* v. *Superior Court, supra,* 71 Cal.App.3d 145, was expressly limited to its facts and has not subsequently been extended. In the family law context, courts have refused to extend the exception to returns of a law corporation and of partnerships of which one spouse is a member (*Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at pp. 1048-1049), to litigation between former spouses in spousal support modification proceedings (*Sammut* v. *Sammut, supra,* 103 Cal.App.3d at pp. 559-562), and to tax records of a new spouse in litigation between former spouses involving child support payments (*In re Marriage of Brown, supra,* 99 Cal.App.3d at pp. 707-709).

The court in *Miller* v. *Superior Court, supra,* 71 Cal.App.3d 145, "had a legislative enactment directing its path to a conclusion that in child support cases, public policy favored disclosure of income tax records." (*Sammut* v. *Sammut, supra,* 103 Cal.App.3d at p. 562.) ▮ A similar legislative mandate exists in this case. As discussed *ante,* part II A, there is a strong legislative policy in favor of fair child and spousal support awards and a fair division of community assets. Moreover, a shareholder has the right to inspect the accounting books and records of the corporation.

No California case has discussed whether the shareholder right of inspection extends to tax returns. In *Friedman* v. *Altoona Pipe and Steel Supply Company, supra,* 460 F.2d at page 1213, the court, interpreting a similar Pennsylvania statute, affirmed a trial court order granting a shareholder the right to inspect, among other records, " 'copies of income tax returns filed by the corporations.' "

We need not decide whether the shareholder's right of inspection extends generally to tax returns. Instead, we rely on the specific facts of this case and the nature of this proceeding to carve out an exception to the general rule of privilege. Here, the marital community and the corporation are closely related; the corporation has but two shareholders, one of whom is Terry, and the marital community owns 30 percent of the stock. This is not a public corporation whose shares have a readily ascertainable market value. These facts, combined with the legislatively declared public policy in favor of full disclosure in a marital dissolution proceeding, warrant an exception to the privilege in this case limited to those tax returns that are reasonably related to the purpose for which they are sought.

The corporate tax returns are clearly related to Marilyn's interest in determining the value of the corporation. The uncontroverted declaration of her accountant explained in detail why these returns were necessary. Moreover, the quarterly payroll tax return information regarding Terry himself is related to Marilyn's interests in ascertaining the parties' financial status, and is thus discoverable. Marilyn is certainly entitled to information regarding the community's own taxes.

Payroll tax information regarding employees other than Terry is more problematic. The accountant's declaration stated only that "[t]his information is further necessary to verify and cross check or to otherwise confirm compensation pay to the various officers which include [Terry]." This is insufficient. Marilyn has not explained the need for tax information regarding other employees. As in *Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at page 1050, the only apparent effect of the production of this information would be to invade the privacy of those employees. Absent a specific showing of relevance or need, we hold that the general privilege against coerced disclosure of tax returns applies to that information, and that the courts below therefore erred in ordering its production.

Thus, we conclude that the corporate tax returns and the payroll tax returns regarding Terry himself are discoverable, but that information in the payroll tax returns identifying persons other than Terry is privileged and may be withheld. *Rifkind* v. *Superior Court, supra,* 123 Cal.App.3d at pages 1048-1049, is disapproved to the extent it holds, inconsistently with this opinion, that all tax returns are absolutely privileged.

## III. Conclusion

The trial court acted within its discretion in compelling Orange Container to produce its business records and its corporate tax returns and quarterly payroll tax returns regarding Terry himself, but not payroll tax information identifying third persons. The judgment of the Court of Appeal is reversed insofar as it affirmed the order compelling production of quarterly payroll tax information identifying third persons, and the matter is remanded for further proceedings consistent with the views expressed herein.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.